IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
October 6, 2020 Session

## IN RE JAYLAN J., ET AL.

**Appeal from the Juvenile Court for Shelby County
No. DD4025  Harold W. Horne, Special Judge**

_____

**No. W2019-02025-COA-R3-PT**

_____

This appeal involves the termination of parental rights of a mother and a father.  The trial court found by clear and convincing evidence that several grounds for termination had been proven and that termination was in the best interest of the two children.  The mother and the father separately appealed.  On appeal, the Department of Children's Services "does not defend" some of the grounds that the trial court concluded were established.  However, DCS maintains that three grounds for termination were sufficiently proven against the mother and that one ground was sufficiently proven against the father.  We conclude that two of the remaining grounds for termination alleged against the mother were sufficiently proven, but we do not find clear and convincing evidence that termination of her parental rights is in the best interest of the children.  We conclude that the sole remaining ground alleged against the father was not proven by clear and convincing evidence.  As such, we reverse the termination of parental rights and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed in Part, Reversed in Part, and Remanded**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and ARNOLD B. GOLDIN, J., joined.

David J. Kreher, Cordova, Tennessee, for the appellant, Anisha A.

Autumn Chastain, Memphis, Tennessee, for the appellant, Timothy S.

Herbert H. Slatery, III, Attorney General and Reporter, and Amber L. Seymour, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

## I.  FACTS & PROCEDURAL HISTORY

This appeal involves parental rights to two children.  The oldest child, Justin, was born in December 2005 in Southaven, Mississippi.  His parents, Anisha A. ("Mother") and Timothy S. ("Father"), were unmarried, and no father was listed on his birth certificate.  Mother informed Father that Justin was his child, but Father had been living in Minnesota for several years at the time of Justin's birth.  (Father's parents resided in Mississippi, and the child was conceived when Father had traveled to Mississippi.)  Father continued to reside in Minnesota after Justin's birth, while Justin resided with Mother.  Father returned to Mississippi and visited with Justin generally around holidays and birthdays.  The second child at issue, Jaylan, was born in October 2008 in Germantown, Tennessee.  Jaylan's birth certificate identified his parents as Mother and Calvin J.  Justin and Jaylan initially resided with Mother, Calvin, and Mother's daughter Saniiyah, in Memphis.[1]

On May 15, 2010, two-year-old Saniiyah was found dead in the home.  Four-year-old Justin and one-year-old Jaylan were immediately placed with their grandparents, who lived in the area.  DCS filed a petition in the juvenile court of Shelby County to adjudicate Justin and Jaylan dependent and neglected and sought a no-contact order prohibiting Calvin from having contact with the children.  The petition did not list any specific respondents.  The petition alleged that Saniiyah's death had been ruled a homicide and that Calvin and Mother had been arrested and charged with first degree murder and perpetration of aggravated child abuse and neglect.  The petition alleged that a child and family team meeting had been held with the grandparents and that Justin and Jaylan were residing with them.  The petition asked the court to award temporary custody of the children to the maternal grandmother, declare the children dependent and neglected, and find that Saniiyah was the victim of severe abuse.  The only mention of Father throughout the petition was the following sentence: "The father of Justin A[.] is Timothy S[.] who resides in Kentucky (address is unknown at this time)."  There is nothing in the record to indicate that Father has ever resided in Kentucky.

On the same day the petition was filed, the juvenile court entered a protective custody order bringing Justin and Jaylan into the protective custody of the court and awarding temporary custody to the maternal grandmother.  After a preliminary hearing, the court entered an order confirming the award of temporary custody to the maternal grandmother and providing that Mother would have "temporary visitation privileges" supervised by the maternal grandmother.

DCS contacted Father at some point in 2010 and asked him to come to Memphis from Minnesota.  Father informed DCS that he could not come to Tennessee at that time

---

[1] We refer to these individuals by their initials to protect the privacy of the minors.  We also note that Calvin is not a party to this appeal, but his involvement with the children is discussed to provide background information about their circumstances.

because he and his girlfriend were "looking for a place" and temporarily staying in a one-bedroom apartment with his girlfriend's mother, Father's other two children, and his girlfriend's child. Father said he and his girlfriend could not take any more children at that point. However, Father communicated directly with the maternal grandmother and confirmed that she was taking custody of both boys.

After another hearing before a juvenile court magistrate, the juvenile court entered an order on March 18, 2011, declaring Justin and Jaylan dependent and neglected and finding that Saniiyah was the victim of severe abuse in the custody of Mother and Calvin. The order did not mention Father. The court found no proof of direct physical harm to Justin or Jaylan. It found strong circumstantial proof that the abuse of Saniiyah was caused by Calvin and that Mother should have known of the abuse and failed to protect her. Mother appealed to the circuit court.

After a hearing on August 12, 2011, the circuit court likewise held that Justin and Jaylan were dependent and neglected and that Saniiyah was the victim of severe abuse. The order did not mention Father. It described Mother's statement to police, in which she admitted that she and Calvin used physical punishment. Mother admitted that at various times she had spanked the child with her hand, hit her with a comb, and pinched her. She acknowledged that Calvin would sometimes "smack" Saniiyah in the chest and knock her to the ground or hit the child with his hand or a belt, shoe, or hairbrush. Mother was at work on the day that Saniiyah received the injuries that led to her death. When Calvin and the children picked her up from work at around 8 p.m., Calvin told her that Saniiyah had been behaving badly and had an accident in her pants. Mother noticed that Saniiyah was acting weak, slouched over, and spitting up on herself. At home, Saniiyah was walking very slowly and had to be carried by Mother to a pallet, where she began vomiting yellow and red fluid. Calvin told Mother that Saniiyah had eaten a popsicle and that she was "acting." Mother noticed that the child's hands were cold. She saw Calvin roughly grab and turn the child's head and grab her arm to make her lie down. The next morning, Saniiyah was found deceased lying on the floor in another room.

The order also summarized the forensic interview of Justin, who was four at the time of Saniiyah's death. He and Jaylan had seen Calvin hold Saniiyah by the neck, throw her against a wall, and beat her with shoes and a belt. Saniiyah also told Justin that Calvin threw her on the toilet. Justin reported that his sister was bleeding from the mouth. The medical examiner who performed the autopsy on Saniiyah testified by deposition. He found bruises on her head and chest, hemorrhaging in the brain, new rib fractures in addition to fractures that had healed over time, bruising and hemorrhaging around the intestine, blood in the peritoneal cavity, and lacerations of the liver consistent with blunt force trauma equivalent to a motor vehicle crash. The cause of death was determined to be blunt force injuries to the torso, and the manner of death was ruled a homicide.

The circuit court found that Calvin committed severe abuse of Saniiyah by beating

- 3 -

her and that "[Mother's] failure to protect Saniiyah rose to the 'knowing' requirement to establish severe abuse[.]"[2]  It found that Mother did not seek medical attention for Saniiyah despite witnessing signs for hours that she was in serious distress with symptoms of a severe injury.  Regarding disposition for Justin and Jaylan, the circuit court noted that they had resided with their grandmother since Saniiyah's death.  DCS recommended the grandmother as a suitable relative placement, and the grandmother had agreed to provide "eyes on" supervision of Mother during her visits with the children.  The court found that the grandmother was employed, able to provide support, and an appropriate caregiver for the children.  As such, the court found it in the best interest of Justin and Jaylan to be placed in the "permanent custody" of the grandmother.

After the dependency and neglect appeal concluded in 2011, Justin and Jaylan resided with their grandmother for several years without incident.  During that time, Calvin was convicted of first-degree felony murder and aggravated child abuse and sentenced to life imprisonment.  Mother pled guilty to attempted aggravated child abuse.  She received a ten-year sentence, which was suspended, and Mother was placed on probation.  While residing with the maternal grandmother, Justin and Jaylan were allowed to continue visiting with Mother.  Justin also continued to visit with Father roughly once a year, when Father traveled to Mississippi or Justin traveled to Minnesota with his paternal grandparents to visit Father there.

In December 2016, the maternal grandmother was arrested for some unspecified offense, and her boyfriend dropped off the children at Mother's house during the middle of the night.  By that time, the boys were ages eleven and eight.  Mother took the boys into her home and contacted DCS.  A woman came to Mother's home, took photographs, asked questions, and informed Mother that she needed to obtain paperwork from juvenile court before she could enroll the children in school.

On January 17, 2017, Mother filed a pro se petition for dependency and neglect, alleging that the children's guardian, the grandmother, was incarcerated and unfit to care for the children.  Mother sought modification of the 2011 order granting permanent custody to the maternal grandmother.  The petition stated that Jaylan's father was incarcerated and that Justin's putative father was Timothy S., address unknown.  Mother's petition stated that she was now stable and that she desired to have the children legally in her care and custody.

On March 7, 2017, a hearing was held before a juvenile court magistrate.  The written order states that "on the Court's own motion," the magistrate determined that the

---

[2] *See* Tenn. Code Ann. § 37-1-102(b)(23)(A) (2010) (defining severe child abuse as "[t]he knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause great bodily harm or death and the knowing use of force on a child that is likely to cause great bodily harm or death").

children "should be brought within the custody of the court." The magistrate found probable cause to believe that the children were dependent and neglected and determined that it was in their best interest to enter foster care. The children were placed in the custody of DCS and sent to a foster home in Memphis. A preliminary hearing was held on March 10. The court entered a second order finding no less drastic alternative than to place the children in DCS custody. The order stated that DCS was relieved of making reasonable efforts toward reunification with Mother. It also stated that the children would have to be assessed by a therapist before the court would approve any visitation with Mother. The children attended counseling, and Mother's visitation was reinstated at some point.

On or about April 4, 2017, Father was en route from Minnesota to Mississippi when he called Mother to arrange a visit with Justin and Jaylan. (Father routinely communicated with Mother about the boys even though she did not have legal custody.) Mother informed Father, for the first time, that the boys had been placed in a foster home less than a month earlier. She told him that a meeting about them was scheduled for 2:00 p.m. that same day. As a result, Father traveled to Memphis and attended the child and family team meeting with DCS that afternoon. Father informed DCS that he wanted to do whatever was necessary to obtain custody of not only Justin but also Jaylan. Mother attended the meeting as well.

A family permanency plan was developed during the meeting, which included a "Statement of Responsibilities" for Father and Mother.[3] The plan listed Father as Justin's putative father and included his contact information in St. Paul, Minnesota. For Justin, the plan listed dual goals of return to parent or adoption, and for Jaylan, the plan listed a goal of exiting custody with a non-relative or adoption. The plan set a target date one year later, on April 5, 2018. The plan noted that Justin and Jaylan had been placed in a foster home less than a month earlier. It stated as a "strength" that they had "found residential stability" in DCS custody. As a "concern," regarding residential stability, the plan stated, "[Father] has recently come forward to seek out custody for Justin [] and Jaylan []. The father has lived in Minnesota and is willing to move to Mississippi so that he could be around family and a support system." The plan also noted as a concern that Father was only a putative father and that he had not been "around" for several years. Even though Father lived in Minnesota, the statement of his responsibilities required him to contact DCS, Omnivision, or the foster parent to schedule visits with the children at least twice per month for a total of at least four hours per month. The Statement of Responsibilities also required Father to go to juvenile court with Mother to legitimate Justin. It also required Father to "inform the

---

[3] We note that one ground for termination alleged against Father was substantial noncompliance with the permanency plan. However, this ground was not alleged against Mother. As such, we will focus on the Statement of Responsibilities listed for Father without as much emphasis, at this point, on the tasks listed for Mother. The plan required her to go to court with Father to legitimate Justin, maintain stable housing and income, complete a parenting assessment at her expense, and visit the children. However, it also noted that DCS had been relieved of making efforts to assist Mother so she would be responsible for completing these tasks on her own.

department" when he had moved to Mississippi so that DCS could work on an ICPC study. He was required to "obtain and maintain stable housing and income." The plan stated that Father would "show proof of stability with utilities and will ensure the home is suitable for the youths." Finally, Father was required to participate in a parenting assessment and follow all recommendations. The April 4 permanency plan was ratified by the juvenile court on June 16, 2017.

Although Father initially continued to reside in Minnesota, he attended a hearing in the dependency and neglect case on May 23, 2017, but the matter was continued. That same day, the children's guardian ad litem filed an intervening petition in the dependency and neglect action. The guardian ad litem alleged that Mother should not be "eligible" for consideration as a custodian for the children because she was still serving a ten-year probated sentence in connection with Saniiyah's death seven years earlier. The guardian ad litem acknowledged that Father had "appeared at both the parenting team meeting and before the Court and indicated that he intended to take custody of both boys," but that he had not yet established paternity. Thus, the guardian ad litem supported leaving the children in the custody of DCS.

Another hearing was held in the dependency and neglect case on August 1, 2017. Father was present for this hearing as well, and so was Mother. The juvenile court magistrate dismissed Mother's initial petition insofar as custody was concerned because of the prior adjudication of severe abuse and her ten-year sentence. The court granted the intervening petition of the guardian ad litem. The magistrate found clear and convincing evidence that Justin and Jaylan were dependent and neglected because their guardian, the maternal grandmother, had been incarcerated for a period of months and did not seek to retrieve the children upon her release. After concluding that the children were dependent and neglected, the court then evaluated the children's best interest with regard to custody. The magistrate noted that Father "has taken some steps as previously outlined by both the Court and the Department, [but] he has not taken any substantial steps toward meeting the legal standard sufficient to be considered as a custody placement." The magistrate concluded that it was in the best interest of the children to remain in the custody of DCS. One week later, on August 8, 2017, a DNA test report was issued confirming that Father is in fact Justin's biological father. A request for a rehearing by a juvenile court judge was also filed in the dependency and neglect case.

In December 2017, Father moved from Minnesota to Nesbit, Mississippi, not far from Memphis. Father moved in with his father. Notes from a foster care review board meeting on January 3, 2018, indicate that Father was "just moving here" but that visitation had "started" and he had already attended one visit. The notes also state that "[Father] a/w court to sign birth cert." However, DCS would not permit the child to cross state lines to visit with Father in Mississippi. According to the testimony of family service worker, Larry Foster, "[t]he only way he could cross state lines is through a travel authorization, and I don't believe we had done a travel for him to go to Mississippi to the grandfather's

house."

The permanency plan was revised on February 27, 2018. All parties participated in the child and family team meeting by telephone, including Father and Mother. The plan's target date was extended from April 5, 2018, to August 27, 2018. The Statement of Responsibilities remained essentially the same, requiring Father to obtain and maintain stable housing and income, legitimate Justin, complete a parenting assessment, and visit the children twice per month for a total of four hours. The only change in his responsibilities was deletion of the requirement to notify DCS when Father moved to Mississippi and replacement with a requirement to "follow through with the ICPC process." The revised plan was ratified on March 16, 2018. By March 2018, Father had informed Mr. Foster from DCS that he was working at a Buffalo Wild Wings restaurant, he had provided a letter signed by his father stating that Father was living with him, and the ICPC process was underway.

On April 9, 2018, DCS filed a petition to terminate the parental rights of Mother, Father, and Calvin. The petition noted that Father had been determined to be the biological father of Justin by paternity testing but that he was not yet listed on the birth certificate. The grounds for termination alleged against Father were abandonment by willful failure to visit or support, substantial noncompliance with the permanency plan, and failure to establish parentage. Against Mother, the petition alleged abandonment by willful failure to visit or support, severe child abuse, sentence for severe child abuse, and failure to manifest a willingness and ability to assume custody. The petition alleged that it was in the best interest of the children to terminate parental rights.

Shortly thereafter, on May 3, 2018, the State of Mississippi issued an amended birth certificate for Justin, listing Father as his father and changing Justin's last name to Father's last name. Father and Mother were present for a hearing in the termination case on June 7, 2018, and the trial court appointed counsel for both. Father and Mother attended another hearing on July 19, 2018, and the case was continued for trial in December. On July 28, 2018, Father moved from his father's house in Nesbit, Mississippi, to live with a girlfriend (whom he had met months earlier) in Republic, Missouri. At some point, Father married his girlfriend. Within a month of his move, Father began working at the local Buffalo Wild Wings.

On August 30, 2018, another hearing was held in the rehearing of the dependency and neglect case. Father returned from Missouri to attend the hearing, but the matter was continued again. Notes from a foster care review board meeting on September 4, 2018 state that Father had moved out of state in July, that he was currently living in Missouri, and that he "needs to redo" the ICPC.[4] The notes reflect that Father "wants to adopt." The

---

[4] At trial, Mr. Foster testified that he was unaware that Father had moved from Mississippi to Missouri in July and that he did not learn this fact until a December court hearing that Father attended.

notes further reflect that Father "was visiting regularly prior to moving out of state in July" and was visiting "often." The summary states that Father had completed the tasks of legitimating Justin and completing a parenting assessment and following its recommendations. However, the notes state that Father had not completed the requirements of maintaining stable housing and income, visiting four hours per month, or completing the ICPC process.

The termination trial scheduled for December was continued and rescheduled for February. DCS subsequently filed an amended termination petition alleging one additional ground against Father (failure to manifest a willingness and ability to assume custody) and deleting one ground alleged against Mother (abandonment by failure to visit). Father returned from Missouri and attended the termination hearing on February 28, 2019, but the court entered an order stating that it "ran out of time to hear this matter today as there were no available courtrooms in the afternoon as there were no court deputies available due to training of court personnel." The court acknowledged that a continuance was not in the best interest of the children but reset the termination trial for June. Father was also present for the rehearing of the dependency and neglect case on February 28, 2019, but a similar order was entered stating that the court "ran out of time to hear this matter today as there were no available courtrooms in the afternoon" and no court deputies due to training. It was also rescheduled for June.

The permanency plan was revised again on March 1, 2019. The plan reflected Father's address in Republic, Missouri. The goal was changed solely to adoption. DCS altered Father's Statement of Responsibilities. The original requirement for him to "obtain and maintain" stable housing and income was changed to only require him to "maintain" stable housing and income. It added new requirements for Father to provide proof of housing with a copy of a lease, show proof of income with a copy of his paycheck stubs, provide "proof" of legitimation of Justin, and maintain contact with DCS. The plan stated that DCS would "follow through with submitting another ICPC for [Father] since he has moved to Missouri," and Father would "follow through with the ICPC process." The plan required Father to visit four hours per month. All parties participated in the development of the plan by phone, including Father.

Father returned to juvenile court on June 13, 2019, for the rescheduled termination trial and rescheduled rehearing of the dependency and neglect case. An order was entered in the termination case stating that the court "ran out of time to hear this matter today as it was conducting a contested rehearing on the dependency portion all day." Thus, the termination trial was rescheduled again for July. The dependency and neglect rehearing was conducted on June 13 and June 17 before a magistrate appointed as special judge. The

However, the foster care review board summary from September 4 states that Father had moved out of state in July and that he was living in Missouri. Mr. Foster signed the foster care review board summary on September 4. Thus, it appears that Mr. Foster knew of Father's July 28 move at least by September 4.

special judge, like the magistrate before, dismissed Mother's original petition insofar as custody was concerned due to the prior adjudication of severe abuse and her ten-year sentence. The special judge applied Tennessee Code Annotated section 37-1-130(c), which states, "No child who has been found to be a victim of severe child abuse shall be returned to the custody or residence of any person who engaged in or knowingly failed to protect the child from the brutality or abuse unless the court finds on the basis of clear and convincing evidence that the child will be provided a safe home free from further such brutality and abuse." The special judge found no clear and convincing evidence that Mother would provide a safe home because "she doesn't believe that she did anything wrong relating to her daughter" and testified that she "should not have plead guilty to the criminal charge, she just wanted to get out of jail." The special judge granted the intervening petition filed by the guardian ad litem and found the children dependent and neglected because the maternal grandmother was incarcerated for a period of time, she did not seek to retrieve the children upon her release, and the children suffered "educational neglect" in her care. He also found that Father "failed to support said child and his visitation was sporadic." Like the magistrate before, the special judge found that Father "has taken some steps as previously outlined by both the Court and the Department, [but] he has not taken any substantial steps toward meeting the legal standard sufficient to be considered as a custody placement." The special judge found that Father "has not visited said child face to face in 2019, other than token visitation during court, and he has failed to support said child." As such, the special judge found that it was in the best interest of the children to remain in DCS custody. The order specified that the parties could appeal to circuit court within ten days. Father appealed the dependency and neglect action to circuit court.

The termination trial was conducted over the course of two days -- July 18 and September 5, 2019. At the outset, DCS announced that it was striking the "putative father grounds" against Father because he had provided a birth certificate with his name on it. As such, for Father, this left the grounds of abandonment by willful failure to visit or support, substantial noncompliance, and failure to manifest a willingness and ability to assume custody. For Mother, the remaining grounds were abandonment by willful failure to support, severe child abuse, sentence for severe child abuse, and failure to manifest a willingness and ability to assume custody.

The trial court heard testimony from Father, Mother, thirteen-year-old Justin, and Mr. Foster, the DCS family service worker. Father testified that he had lived in Minnesota for fifteen years, and while living there, he saw Justin when he traveled to Mississippi or when his parents brought Justin to Minnesota for visits there. Father acknowledged that DCS contacted him in 2010 when Saniiyah died but said he and his girlfriend were unable to take in another child at that time because they were looking for a place to live and staying in a one-bedroom apartment with her mother and their three children. Father said he communicated with Justin's maternal grandmother directly and also maintained contact through Mother and his parents. Father estimated that he saw Justin about seven times

between 2010 and 2017 -- twice in Minnesota and five times in Mississippi. He said he also talked to Justin throughout the school year. Father said he provided Mother and the grandmother with money and items for Justin while he was in their care. Father said when he sent gifts or items for Justin, he also provided them for Jaylan so that one child was not "singled out." Father said he considered Jaylan to be "family" even though they were not related by blood.

Father testified that DCS did not contact him when Justin was placed in DCS custody in March 2017, and he learned about the situation in April when he contacted Mother about scheduling a visit. Father said that he attended the child and family team meeting that same day and told DCS that he wanted to do whatever was necessary to get custody of Justin and Jaylan. Father testified that he moved from Minnesota to Mississippi in December 2017 to "get Justin out of foster care" and also care for his father, who was suffering from Alzheimer's disease. Father worked at Buffalo Wild Wings while in Mississippi. He said he contacted the foster parent directly, and they set up visits "regularly" and "fairly often." Father said it was his understanding that "they were doing an ICPC study" to determine whether his home in Mississippi would be a good placement for Justin. Although Father lived in Mississippi for seven months, the ICPC study was not completed by the time he moved to Missouri in July 2018.

Father acknowledged that when he lived in Nesbit, Mississippi, he would generally meet the foster parent for visits ten to fifteen minutes away from his home, but his current home in Missouri was around five hours away from Memphis. Still, Father testified that he decided to move because he felt that in Missouri he could provide a better and safer place for the kids compared to the Memphis area. He had researched schools and did not feel that Memphis was a safe environment for raising two young boys. Father also said that his father was in an agitated state due to his Alzheimer's disease, and he worried about what might happen if the children were there. Father said his wife's home "had extra room" for the children to come live with them there. Father said he had contacted the Buffalo Wild Wings restaurant near his wife's home before the move, and they agreed to start him out "at a nice rate." He began working there within a month of his move to Missouri.

At the time of trial, Father had been residing with his wife in the same location in Republic, Missouri, for one year. Father admitted that the frequency of his visits had "tapered" after he moved to Missouri. However, the testimony about his visits was a bit unclear. Initially, he estimated that over the past year, he had visited with Justin four to five times on dates that were not court dates. Later, however, Father appeared to concede that he was mistaken and that those visits he described had occurred while he lived in Mississippi. Father had not driven from Missouri to Tennessee for the sole purpose of a visit without also attending court while in town. He said he tried to coordinate visits with Justin around the many court dates when he would already be returning to Tennessee so that he would have less days off work. He said that it was also difficult to schedule visits with the children being in school and him working weekends. Father was working two

jobs in Missouri. He testified that he had five other children living up north and essentially worked one job to pay toward his children and a second job to pay his own bills. Father also pointed out that DCS required him to maintain employment.

At first, in Missouri, Father had worked full-time (plus overtime) at Buffalo Wild Wings, Monday to Saturday from 4 p.m. until closing. He also worked at McDonald's, Tuesday to Saturday from 6 a.m. to 2 p.m. By the time of trial, Father was still working at McDonald's as a "manager in training," and he was working a second job at Foot Locker in the evenings from 5 p.m. to 10 p.m. and on some Sundays. Thus, Father explained that he had already taken time off work from these jobs to attend the many hearings in Tennessee in the dependency and neglect case as well as the termination case. Father testified that whenever he attended a court hearing, he would talk with the foster parent after court and ask for time to be with Justin either that day or another day. He often drove to Tennessee for hearings and returned to Missouri in the same day. One month before trial, Father had visited with Justin for Father's Day at a relative's house for an hour after a court appearance. He also described taking Justin to Bartlett to get a haircut in the fall of 2018 and buying him food or games "[w]henever [he had] seen him" that fall. He said there were other times when he tried to coordinate visits with the foster parent in Memphis, but she already had plans on the days he requested.

Father said he maintained telephone communication with Justin when he was unable to visit, either through the foster parent's landline phone, Justin's cell phone, video chats online, or online video games. He estimated that he communicated with Justin at least once or twice a week. Father testified that DCS never told him that he should send child support to the foster parent but that he had purchased things for Justin and bought items during visits, such as video games, food, or a haircut. He testified that he would be able to provide for Justin's needs on a daily basis.

Regarding the permanency plan requirements, Father testified that he was asked to submit to a DNA test to show that he was Justin's father, and he did so. He said after the result came back in 2017, he went with Mother and presented the results in order to have his name added to the birth certificate for Justin. Father testified that he was asked to take a parenting assessment and completed that requirement as well. As for stable housing, Father said he relocated from Minnesota to Mississippi in an effort to get Justin out of foster care, but after waiting seven months on the ICPC process, he decided to move to Missouri. Father said he provided DCS with his address and information regarding where he would be in Missouri and had maintained that home for one year. Father said he was asked to maintain employment, and he had done so and provided DCS with his employment information. Father said that the ICPC process was underway in Missouri and that someone came to his house and did a home study with him and his wife, but the process was not finalized yet because they were still waiting on a background check from Mississippi. He said the background check from Minnesota had already been received. Regarding visitation, Father said he had asked to visit with Justin and tried to maintain

visits to the best of his ability, and he maintained communication even when he was unable to visit in person. Father said he was never offered any assistance related to visitation.

Father acknowledged that Justin and Jaylan had a very close bond and said he did not want to separate them. He testified that if he was not allowed to assume custody of Jaylan, he would arrange for Justin to continue visiting with Jaylan in Memphis on weekends. Father said that Justin also had many other relatives in and around Memphis, including Mother and many grandparents, and he did not feel it would be in Justin's best interest to take him away from his relatives through termination of parental rights or otherwise.

Mother testified as well. She confirmed that Father was in Minnesota when Justin was born but that he visited with Justin around holidays. She recalled Father attending three of Justin's birthday parties. Mother said Father sent her $300 to $400 every other month or so, and if she asked him for something in particular, he would send it.

She testified briefly regarding Saniiyah's death in 2010. Mother maintained that she did not know that Calvin was abusing Saniiyah. However, she said that if she had the chance to do anything differently, she would take Saniiyah to the doctor. Mother stated, "If I would've just took her, maybe she would still be here, but I just thought she was sick, and I didn't know. So, I didn't go."

Mother testified that the maternal grandmother allowed her to visit with the boys while they lived with her. Mother was aware that Justin had also traveled with Father's parents to Minnesota to visit Father during that time, as she discussed it with the maternal grandmother and saw pictures from the trip. Mother noted that whenever Father came from Minnesota and took Justin for visits, he always took Jaylan with him too. She said the two boys would go visit Father's family with him and that Jaylan calls Father's father "granddad." She said they would also attend church with Father's family. Still, Mother admitted that she did not initially inform Father that Justin and Jaylan had been placed in foster care in March 2017. She said that when she told him when he called in April, he immediately said he wanted to assume custody of both boys so that they would not be separated.

Mother testified that she "tried to do the right thing" by notifying DCS when the children were brought to her home. She had sought modification of the custody order, and the children lived with her from December 6, 2016, until March 7, 2017. Although Mother was not permitted to visit Justin and Jaylan right after they were removed from her home and placed in foster care, the children had attended counseling, and visitation was subsequently approved. Since that time, Mother had maintained regular communication and visitation with them. She visited the children one to three times per month and talked to the children on the phone three to four times per week. She sent gifts for them every once in a while. Mother was also aware that Father had bought shoes and clothes for both

- 12 -

Justin and Jaylan to go back to school. She said that Justin had "FaceTimed" her to show her his clothing and shoes.

At the time of trial, Mother had been working at Taco Bell for the past three years. She had been in her current residence for over two years with a lease in her name. Aside from Justin and Jaylan, Mother had a two-year-old son and a seven-year-old daughter. The son lived with Mother, but the daughter was born in 2012 when Mother was in jail and had resided with a grandmother ever since. Mother retained legal custody of the daughter and had visits with her every other weekend. Justin and Jaylan had also visited with the daughter (their half-sister) when they lived with the maternal grandmother. Mother testified that she had completed community service, moral recognition therapy, anger management, and parenting classes, all as terms of her probation.

Mother believed that the boys should be permitted to "go home with family," whether it was to her home or Father's home. She acknowledged that the boys had been in foster care for two years but said they had always lived with family otherwise. She said the boys had family members and siblings that they "don't get to see." Mother also knew Father's wife, thought "very highly" of her, and believed that she would be appropriate to care for the children. Mother believed the children would be in a safe environment with Father and that he would provide for their needs. She also believed that Father would permit her to maintain contact with the boys while in his care. Mother thought that it would be very hard on the boys if they were separated.

Larry Foster from DCS also testified. He had been assigned to the case since the children entered foster care in March 2017. Mr. Foster noted that DCS was relieved of making efforts to reunite Mother with the children. However, Mr. Foster said he explained to Father what he would need to do in order to gain custody of his child, and those requirements were put in the form of a permanency plan. Mr. Foster also explained the criteria for terminating parental rights to the parents.

Mr. Foster testified that Father informed him of his move to Mississippi so that the paperwork could be completed for the ICPC process and that DCS helped Father complete the paperwork. He testified that Father also let DCS know that he was working at Buffalo Wild Wings in Mississippi, and he received a letter signed by Father's father stating that he was living with him. Mr. Foster testified that Father's visitation while living in Mississippi was "kind of sporadic but often." He said that Father set up visits directly with the foster mother. Mr. Foster was aware that the child would sometimes go to church with Father and his family, but he said that it was under the supervision of the foster parent.

As previously noted, Mr. Foster testified that he was unaware that Father had moved to Missouri in July until Father attended a court hearing in December. (However, the foster care review board summary from September 4 suggests otherwise.) Aside from that one time period, Mr. Foster agreed that Father had maintained contact with DCS and was

- 13 -

always "cooperative" and "responsive" when he needed things from Father. Mr. Foster said that Father never expressed that he needed any kind of financial assistance or help coming to visits, so DCS never offered any of those things to him. Mr. Foster said he never received a paycheck stub from Father but that Father did send him a picture of something printed from a cash register at the McDonald's where he was employed in Missouri, showing the physical address.

Mr. Foster acknowledged that Father wanted to take both boys into his home so that they could stay together, but Mr. Foster did not believe Father was in a position to care for a child 'due to the instability of moving from place to place to place and not staying stable in one place for a certain amount of time.' However, Mr. Foster admitted that he was not aware of whether Father's current home in Missouri, where he had been residing for one year, was healthy or safe for children because the ICPC process had not been completed. On the first day of trial, Mr. Foster testified that he had not been in contact with the individual facilitating the ICPC process in Missouri, or the person with that responsibility in Mississippi. By the second day of trial, Mr. Foster had checked on the status of the ICPC and learned that the designated contact person in Tennessee still had not heard anything back from Missouri. The contact mentioned that possibly everything had been completed except receiving something from Mississippi.

Mr. Foster said that even if Justin was placed with Father, DCS "may not consider" placing Jaylan with Father due to the lack of any relational tie. Mr. Foster acknowledged that Mother had also stated that she wanted custody of the boys. He was aware that she had been working at Taco Bell, and Mother had provided him with her address. However, Mr. Foster did not believe that it was in the best interest of the children to be placed with Mother because she was still on probation for the remainder of her ten-year sentence. Mr. Foster testified that the boys were doing very well with their foster mother, aside from one day when they skipped school and could not be located for some time. Mr. Foster believed that it was in the best interest of the children to terminate parental rights.

The trial court also heard testimony from thirteen-year-old Justin. He was entering the eighth grade when the termination trial began. He was doing well in school and played two instruments in the band. His younger brother was ten years old. Justin testified that he visits with Mother at least every month and that he talks to her through social media almost every day. Justin said he also talks to Father every week on his cell phone. He said he receives text messages from Father too, but not every day. Justin said he did not talk on the phone with Father before he entered foster care but that he did have a relationship with Father. Justin described visiting with Father at the grandfather's house in Mississippi and visiting him in Minnesota. Justin could remember seeing Father four times before he had entered foster care, while Father lived in Minnesota and he resided with the maternal grandmother. He said he saw Father "quite a bit" after he moved to Mississippi, but not as often after he moved to Missouri. He described a recent visit with Father at a "pool party" for Father's Day. He said that Father bought clothes for him and video games.

Justin and Jaylan had been living with their foster mother for two years at the time of trial. When asked if he would prefer to be adopted or for his parents to remain his mother and father, Justin responded, "I would rather try to stay with my dad." Justin said he had really enjoyed getting to know his father and seeing him when he is able to come to Tennessee. Justin said the best-case scenario in his mind was for him and Jaylan to both live with Father. He said that Father treated Jaylan like a son too. However, when asked if he would still prefer to live with Father if it meant leaving Jaylan by himself in foster care, Justin said he would want to stay with his brother. He said staying with his little brother was most important to him. Justin initially said if the court found that he could not stay with either Mother or Father, he would be okay with staying with the foster mother and being adopted by her. However, Justin said it was important to him to keep his relationship "going" with Father. He said it would bother him if Father and Mother had their parental rights terminated and were not permitted to contact him anymore. After discussing the possibility of no contact with his parents, Justin acknowledged that he may have changed his opinion about adoption somewhat. He said he would not want something to happen that would take away Father's ability to contact him or "be [his] dad." Justin said he felt safe with Father and thought that he could take care of him. He said he knew why he was not living with Mother but that he did not know why he was not living with Father.

When questioned by Mother's attorney, Justin said he would also take the opportunity to live with Mother if he could. In fact, Justin said that if he could choose, his first choice would be to live with Mother. He remembered his younger sister but said that he is not able to see her now because he visits with Mother at her place of employment. Justin said he sees his two-year-old brother on court dates.

At the conclusion of the testimony, Father's counsel indicated that she wished to present a rebuttal witness, whom she described as "the worker doing the ICPC in Missouri." She said the witness was "available telephonically to state what has been completed and the status of her investigation since February." The special judge responded, "That's not going to help me." He added, "whether he's in various situations has no bearing on the grounds for the termination. If he lives in a castle now making a million dollars a week, it's what happened in that four months prior to the filing of the petition, right?" Father's counsel agreed but said that the witness could testify as to whether she had verified Father's places of employment and his residence. She also said that if a ground was proven, Father's current circumstances and whether he cooperated with the ICPC process would still remain relevant to the best interest analysis. The special judge responded, "Okay. I don't feel I need that."

After closing arguments, the judge announced his oral ruling and stated that the grounds of abandonment by willful failure to visit and support and substantial noncompliance had been proven against Father. However, he found that DCS had *not*

presented clear and convincing evidence that Father failed to manifest a willingness and ability to assume custody. Against Mother, the judge found sufficient evidence to support the grounds of abandonment by failure to support, severe abuse, sentence for severe child abuse, and failure to manifest a willingness and ability to assume custody.[5]

As for the best interest of the children, the judge found "fairly overwhelming" evidence that Mother continues to present a substantial risk of harm to the children. He noted that she had maintained regular visitation with the children and had a meaningful relationship with them, which weighed in her favor, but nevertheless found that termination of Mother's parental rights was in the best interest of the children. The judge also concluded that termination of Father's parental rights was in the best interest of the children. The judge stated that a change of caretakers would be devastating to the children. He also relied "heavily" on the fact that the two brothers could remain together if they remained in the foster home. The trial court entered a written order setting forth its findings of fact and conclusions of law on November 5, 2019. Mother and Father separately filed notices of appeal.

## II.    ISSUES PRESENTED

Father presents the following issues, which we have restated, for review on appeal:

1. Whether Father's due process rights were violated when DCS did not make any statutory allegations against him in the dependency and neglect proceedings such that he should have been given his child;
2. Whether clear and convincing evidence was presented regarding the grounds for termination of Father's parental rights; and
3. Whether clear and convincing evidence was presented to show that termination of Father's parental rights was in the best interest of the children.

Mother presents the following additional issue on appeal:

1. Whether there is clear and convincing evidence that terminating Mother's parental rights is in the best interest of the children.

Even though Mother does not present any issue regarding the grounds for termination of her parental rights, we must review the trial court's decision as to grounds as well. *See In re Carrington H.*, 483 S.W.3d 507, 511 (Tenn. 2016) (holding that "appellate courts must review a trial court's findings regarding all grounds for termination and whether termination is in a child's best interests, even if a parent fails to challenge these findings on appeal").

---

[5] In the final written order, one sentence erroneously states that the court found substantial noncompliance against Father *and Mother*. This appears to be a scrivener's error.

- 16 -

We note, however, that DCS states in its brief on appeal that "the Department does not defend the grounds of abandonment by failure to support against Mother; nor does the Department defend the grounds of abandonment by failure to visit or abandonment by failure to support against Father." We therefore reverse the trial court's findings as to these grounds. *See In re Colton B.*, No. M2018-01053-COA-R3-PT, 2018 WL 5415921, at *6 (Tenn. Ct. App. Oct. 29, 2018) *perm. app. denied* (Tenn. Jan. 22, 2019) ("[W]hen the petitioner who sought termination has conceded on appeal that a ground was not sufficiently proven, this Court has, in several cases, reversed the trial court's finding as to that ground without reaching the merits of whether the ground was actually established."); *In re Zane W.*, No. E2016-02224-COA-R3-PT, 2017 WL 2875924, at *7 (Tenn. Ct. App. July 6, 2017) *perm. app. denied* (Tenn. Sept. 26, 2017) (reversing a ground that DCS "does not defend" and noting that *Carrington* "has never been construed to require this Court to also consider the grounds sustained by the trial court and thereafter conceded or waived by the non-parent on appeal"). As it is, DCS only defends the ground of substantial noncompliance against Father and the grounds of severe abuse, sentence for severe child abuse, and failure to manifest a willingness and ability to assume custody against Mother. We therefore proceed to consider those issues.

### III. STANDARDS APPLICABLE TO TERMINATION CASES

Tennessee Code Annotated section 36-1-113 "sets forth the grounds and procedures for terminating the parental rights of a biological parent." *In re Kaliyah S.*, 455 S.W.3d 533, 546 (Tenn. 2015). Pursuant to the statute, the petitioner seeking termination of parental rights must prove two elements. *Id.* at 552. First, that party must prove the existence of at least one of the statutory grounds for termination set forth in Tennessee Code Annotated section 36-1-113(g). *Id.* The grounds are "cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground." Tenn. Code Ann. § 36-1-113(g). Second, the petitioner must prove that termination of parental rights is in the best interest of the child, considering the best interest factors listed in Tennessee Code Annotated section 36-1-113(i). *In re Kaliyah S.*, 455 S.W.3d at 552.

Because of the constitutional dimension of the parent's rights at stake, the party seeking termination "must prove all the elements of their case by clear and convincing evidence." *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). To be clear and convincing, the evidence must enable the finder of fact "to form a firm belief or conviction regarding the truth of the facts" sought to be established and eliminate "any serious or substantial doubt about the correctness" of the findings. *Id.* Due to this heightened burden of proof applicable in parental termination cases, we adapt our customary standard of review on appeal. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). Appellate courts review the trial court's factual findings de novo in accordance with Tennessee Rule of Appellate Procedure 13(d), presuming each factual finding to be correct unless the

evidence preponderates otherwise. *In re Carrington H.*, 483 S.W.3d at 524. Then, we make our own determination regarding "whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *Id.* (citing *In re Bernard T.*, 319 S.W.3d at 596-97). "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *Id.* (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

## IV.  DISCUSSION

### A.  Due Process

On appeal, Father first argues that his due process rights were violated when the 2010 dependency and neglect petition at the time of Saniiyah's death, failed to include any allegation of abuse or neglect by him. Father argues that DCS "should have immediately respected and upheld the superior parental right of [Father] and sent the child to live within his custody, prior to placing him with a grandmother." Father also suggests that his due process rights were violated in 2017 by "the court's failure to give the child to [Father] before placing him into foster care." He argues that the child was placed in DCS custody "without notice to [Father] and without the attempt to return his child to him," when "there were still no allegations against [Father]."

Having carefully reviewed the record, we conclude that Father's due process argument is waived because he failed to raise it in the trial court. "'Generally, issues raised for the first time on appeal are waived.'" *State v. Allen*, 593 S.W.3d 145, 154 (Tenn. 2020) (quoting *State v. Rowland*, 520 S.W.3d 542, 545 (Tenn. 2017)). This rule applies to due process arguments as well. *See, e.g.*, *In re C.L.*, No. E2013-02035-COA-R3-PT, 2014 WL 2442970, at *7 (Tenn. Ct. App. May 28, 2014) (agreeing with DCS that "Mother may not raise her due process argument for the first time on appeal"); *Lee v. Lee*, 66 S.W.3d 837, 847 (Tenn. Ct. App. 2001) ("There is nothing in the record to indicate that Husband raised an objection at the trial court level regarding his due process or equal protection rights. Therefore, these issues are waived."); *Landry v. Dood*, 936 S.W.2d 635, 637 (Tenn. Ct. App. 1996) ("[A]ppellant has waived his right for this Court to consider a procedural due process claim. It is well settled that issues not presented at trial cannot be raised for the first time on appeal.") As such, Father has waived consideration of this issue.

### B.  Grounds for Termination Against Father

#### 1.  Substantial Noncompliance

As explained above, the only remaining ground at issue against Father is substantial noncompliance with the permanency plan. Interestingly enough, counsel for DCS

acknowledged during closing arguments that this was "the toughest ground" of all those alleged against Father.

"Tennessee law requires DCS to prepare a permanency plan for each child in foster care under its supervision." *In re K.F.*, No. M2008-01742-COA-R3-PT, 2009 WL 1025829, at \*6 (Tenn. Ct. App. Apr. 14, 2009). The parental termination statute provides that one ground for termination exists if "[t]here has been substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan[.]" Tenn. Code Ann. § 36-1-113(g)(2). The requirements of the statement must be "'reasonable and related to remedying the conditions which necessitate foster care placement.'" *In re Valentine*, 79 S.W.3d 539, 547 (Tenn. 2002) (quoting Tenn. Code Ann. § 37-2-403(a)(2)(C)). "Conditions necessitating foster care placement may include conditions related both to the child's removal and to family reunification." *Id.*

Not every failure to comply with a permanency plan will constitute grounds for termination of parental rights. *In re Abigail F.K.*, No. E2012-00016-COA-R3-JV, 2012 WL 4038526, at \*14 (Tenn. Ct. App. Sept. 14, 2012). As the statute clearly reflects, "noncompliance is not enough to justify termination of parental rights; the noncompliance must be substantial." *In re Valentine*, 79 S.W.3d at 548. "Determining whether a parent has substantially complied with a permanency plan involves more than merely counting up the tasks in the plan to determine whether a certain number have been completed[.]" *In re Carrington H.*, 483 S.W.3d at 537. "In the context of the requirements of a permanency plan, the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement." *In re Valentine*, 79 S.W.3d at 548. "Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance." *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004).

Although the terms have sometimes been used interchangeably, this Court has recently clarified that the question is not whether the parent was in "substantial compliance" with the permanency plan. *In re Isaiah B.*, No. E2017-01699-COA-R3-PT, 2018 WL 2113978, at \*15 (Tenn. Ct. App. May 8, 2018). "Section 36-1-113(g)(2) does not require that a parent 'substantially comply' with a permanency plan." *Id.* "Rather, the appropriate standard is whether there has been 'substantial *noncompliance*.'" *In re Jaylah W.*, 486 S.W.3d 537, 555 (Tenn. Ct. App. 2015) (emphasis added); *see also In re Valentine*, 79 S.W.3d at 548 ("the noncompliance must be substantial").

We also recognize that when analyzing this ground, "[o]ur concern is with the parent's *efforts* to comply with the plan, not the achievement of the plan's desired outcomes." *In re Daniel B., Jr.*, No. E2019-01063-COA-R3-PT, 2020 WL 3955703, at \*5 (Tenn. Ct. App. July 10, 2020) (citing *In re B.D.*, No. M2008-01174-COA-R3-PT, 2009 WL 528922, at \*8 (Tenn. Ct. App. Mar. 2, 2009)) (emphasis added). In other words, "'outcome achievement is not the measure of compliance.'" *In re Mya V.*, No. M2016-

- 19 -

02401-COA-R3-PT, 2017 WL 3209181, at *6 (Tenn. Ct. App. July 28, 2017) (quoting *In re B.D.*, 2009 WL 528922, at *11).

Keeping these principles in mind, we begin by examining the requirements set forth for Father in the "Statement of Responsibilities" in the permanency plan. The first plan was developed on or about April 5, 2017 – the same day when Father learned that the children were in foster care and attended the meeting that afternoon. The Statement of Responsibilities required Father to "obtain and maintain stable housing and income" and "show proof of stability with utilities and [] ensure the home is suitable for the youths." The second plan, dated February 27, 2018, maintained this requirement. The third plan, developed on March 1, 2019, required Father to "maintain stable housing and income and [] provide proof of housing with a copy of his lease and [] show proof of income with a copy of his pay check stubs." These requirements were reasonable and related to remedying the conditions necessitating foster placement.

We consider Father's compliance with the requirement regarding housing first. Father lived in an apartment in St. Paul, Minnesota, when the first plan was developed. He had lived in Minnesota for around fifteen years. The first plan stated that Father had "come forward to seek out custody" of both boys and that he was "willing to move to Mississippi so that he could be around family and a support system." Thus, it appears that DCS encouraged Father's first move. Father testified that he moved from Minnesota to Mississippi in December 2017 to "get Justin out of foster care" and also care for his father. He was of the understanding that an ICPC study was being performed in Mississippi to determine whether his home would be a good placement for the children but said it was never completed during the seven months that he resided there. The wisdom of his second move was debatable. Father testified that he decided to move to Missouri in July 2018 because his wife's home had "extra room" for the children to live with him, and his father was in an agitated state due to Alzheimer's disease, which led Father to worry about what might happen if the children lived there. He also believed that Missouri was a safer place to raise two young boys. He researched schools and contacted his potential employer. Father testified that he provided DCS with his address and information regarding where he would be located in Missouri. At the time of trial, Father had been living with his wife in a home in Missouri for one year.

During Mr. Foster's testimony at trial, he was asked if Father had maintained stable housing as required by the permanency plan and responded, "To my knowledge, yes." Mr. Foster said he knew that Father had stable housing at his father's home in Mississippi. He noted that Father never provided him with a copy of any lease as required by the third permanency plan. However, Father testified that he had not had a lease in his name in either location. DCS was provided with a letter from Father's father stating that Father was living with him, and DCS contacted him as well. Mr. Foster was admittedly unaware of whether Father's home in Missouri was healthy and safe for the children because the ICPC process still had not been completed, even though Father had lived there for one year.

- 20 -

Still, Mr. Foster acknowledged, "we believe that he is maintaining his employment and home in Missouri."

During its oral ruling, the trial judge found that Father "made some efforts to provide a home from his proof, and he has a home in Missouri that by all accounts would be safe and appropriate." Considering all of the evidence, we conclude that Father had met the requirement of obtaining and maintaining "stable housing" by the time of trial.[6]

Now, we turn to employment. The first two plans only required Father to obtain and maintain stable employment. The third plan, which was developed four months before trial began, added a requirement for him to "show proof of income with a copy of his pay check stubs." Father worked at Buffalo Wild Wings while in Mississippi, and he worked two jobs in Missouri. First, he worked at Buffalo Wild Wings and McDonald's, then he worked at McDonald's and Foot Locker. He was being trained for a managerial position at the time of trial. Mr. Foster acknowledged that Father "let the Department know" where he was working in Mississippi and told him about his places of employment in Missouri. Father sent Mr. Foster a picture of something printed from a cash register at McDonald's showing its physical address in Missouri. Mr. Foster noted that Father never provided him with any actual pay stubs during the four months that this requirement was in place, but he also said he never asked Father to send him any. As previously noted, Mr. Foster stated, "we believe that he is maintaining his employment and home in Missouri." Thus, we conclude that Father had met the requirement regarding maintaining stable income by the time of trial, and his failure to provide pay stubs does not rise to the level of substantial noncompliance. *See In re Natascha B.*, No. M2018-00247-COA-R3-PT, 2018 WL 5279079, at *6 (Tenn. Ct. App. Oct. 23, 2018) ("Under these circumstances, we conclude Father's failure to provide DCS with his pay stubs was a '[t]rivial, minor, or technical' deviation from the permanency plan's requirements. *See In re M.J.B.*, 140 S.W.3d at 656. As such, we assign little weight to Father's lack of compliance with this requirement."); *In re Zane W.*, 2017 WL 2875924, at *11 (concluding that a mother's failure to submit sign-in sheets from her recovery meetings as "verification" of her attendance did not rise to the level of substantial noncompliance when it was undisputed that she attended).

The first permanency plan also included a requirement that Father must inform DCS when he had moved to Mississippi so that DCS could "work on doing an ICPC." At trial, Mr. Foster admitted that Father "did inform the Department of his move to Mississippi so the paperwork could be completed." Thus, Father complied with this requirement. The second permanency plan deleted the requirement to notify DCS when Father moved to

---

[6] "Improvement toward compliance should be considered in a parent's favor." *In re Valentine*, 79 S.W.3d at 549 (considering that the parent's "poor record of visitation prior to the filing of the termination petition [stood] in marked contrast to her commendable efforts in the year prior to the hearing"); *see also In re Aiden R.*, No. E2015-01799-COA-R3-PT, 2016 WL 3564313, at *9 (Tenn. Ct. App. June 23, 2016) ("While Father was slow in complying, by the time of the hearing, he had accomplished or begun work on the majority of the requirements.").

Mississippi and replaced it with a requirement to "follow through with the ICPC process." There was no testimony to suggest that Father failed to comply with this requirement. Father testified that the ICPC study was being conducted in Mississippi and that it was not completed despite the fact that he lived there seven months. He testified that the ICPC process was underway in Missouri and that someone had come to his house to do a home visit and home study with him and his wife. He had been residing in Missouri for one year, and from what he understood, the only outstanding issue was the receipt of the background check from Mississippi.

Mr. Foster testified that DCS helped Father complete the ICPC paperwork. He testified that DCS "continued to check in with the ICPC to make sure the process was going smooth[ly]." Mr. Foster said, "We didn't receive anything from Mississippi." Although he suggested that Father's move to Missouri "disrupt[ed] the process" in the sense that it had to be restarted in Missouri, he did not testify as to any action by Father that would suggest that he did not cooperate with the ICPC process. As previously noted, Father asked to call a rebuttal witness by telephone to testify as to his compliance with the ICPC process in Missouri, but the trial judge denied his request. From the record before us, we conclude that Father met the requirement to "follow through" with the ICPC process. *See In re Heaven J.*, No. W2016-00782-COA-R3-PT, 2016 WL 7421381, at *10 (Tenn. Ct. App. Dec. 22, 2016) (finding that a father complied with a permanency plan requirement regarding the ICPC where there was "no testimony that Father failed to do anything that was asked of him with regard to the ICPC process").[7]

---

[7] We note that Father raises a separate argument on appeal regarding whether, as a parent, he should have been required to go through the ICPC process in the first place. He notes that in *In re Courtney R.*, No. M2015-01024-COA-R3-JV, 2017 WL 1548241, at *5 (Tenn. Ct. App. Apr. 28, 2017), this Court stated that "Article III of the ICPC . . . qualifies the types of placements subject to the requirements of the ICPC" when it states, "'No sending agency shall send, bring, or cause to be sent or brought into any other party state any child for *placement in foster care or as a preliminary to a possible adoption* unless the sending agency shall comply with each and every requirement set forth in this article[.]'" However, we also noted that "in the case of parents," the ICPC Regulations lead to "confusion over the applicability of the ICPC." *Id.* at *6. We noted "seeming inconsistences between the ICPC and the ICPC Regulations" and that there is, nationwide, "some dispute over whether the ICPC Regulations can serve to expand the scope of the ICPC beyond its plain terms." *Id.* at *5 n.12; *see also* Josh Gupta-Kagan, *The Strange Life of Stanley v. Illinois: A Case Study in Parent Representation and Law Reform*, 41 N.Y.U. Rev. L. & Soc. Change 569, 621 (2017) (noting the trend "in the most recent Interstate Compact cases, which have ruled against its application to parents"); Vivek S. Sankaran, *Out of State and Out of Luck: The Treatment of Non-Custodial Parents Under the Interstate Compact on the Placement of Children*, 25 Yale L. & Pol'y Rev. 63 (2006); *see, e.g.*, *In re S.R.C.-Q.*, 52 Kan.App.2d 454, 464 (2016) ("[W]e hold that the ICPC applies only to out-of-state placements of children with foster care or as a preliminary to a possible adoption, not to out-of-state placements with a parent."); *Matter of B.H.*, 398 Mont. 275, 301 n.13 (2020) (assuming without deciding that the ICPC applied but noting that "a growing number of states have rejected the validity of applying the ICPC [] to non-custodial parents"); *In Interest of C.R.-A.A.*, 521 S.W.3d 893, 904 (Tex. Ct. App. 2017) (adopting the reasoning of the states that "have rejected application of the ICPC to interstate placement of a child with a natural parent" based on the plain language of Article III).

Ultimately, however, in *In re Courtney R.*, this Court concluded that one particular ICPC regulation

The next responsibility listed in the initial April 5, 2017 permanency plan was for Father to go to juvenile court with Mother and legitimate Justin. This requirement was reasonable and related to the conditions necessitating foster placement. On August 8, 2017, a DNA test report was issued confirming that Father is Justin's biological father. Father testified that when the DNA test result came back, he went with Mother and presented the result to have his name added to the birth certificate. The summary from the foster care review board meeting on January 3, 2018, states that "[Father] a/w court to sign birth cert." On May 3, 2018, the State of Mississippi issued an amended birth certificate for Justin, listing Father as his father and changing Justin's last name to Father's last name. The third permanency plan added a requirement for Father to provide "proof" of legitimation, and Mr. Foster acknowledged at trial that Father sent him a picture of the birth certificate via text message when he asked him to do so. Mr. Foster then asked Father to mail him a copy. During closing argument, counsel for DCS stated that "[Father] did produce a birth certificate before trial, showing that he legitimated the child," and DCS concedes in its brief that this requirement was met. We agree.

The next responsibility was for Father to participate in a parenting assessment and follow its recommendations. This requirement was reasonable and related to conditions necessitating foster placement. Both Father and Mr. Foster testified that Father completed this requirement. Mr. Foster said, "[Father] was willing to travel to Memphis to get that parenting assessment completed[.]" Mr. Foster testified that DCS "did get a copy of that back from the actual assessment," and there was no testimony that Father failed to comply with any recommendation of the assessment. DCS concedes, and we agree, that Father met this requirement.

The third permanency plan added a requirement for Father to maintain contact with DCS. This was a reasonable and related requirement, and Mr. Foster testified that Father also met this requirement. He acknowledged that Father remained cooperative throughout the process and that he could text message or call Father whenever he needed something. Mr. Foster agreed that Father was "always responsive" and provided copies of anything he requested.

The last requirement in the statement of the parents' responsibilities was for Father

---

exempted the father in that case from the ICPC, so the result was the same under either approach. 2017 WL 1548241, at *6 & n.12. We also note a passing reference to the ICPC in *In re Gabriella D.*, 531 S.W.3d 662, 669 (Tenn. 2017), in which our supreme court stated that the ICPC "required DCS to obtain the approval of" a Georgia agency before placing the children with the mother in Georgia when she was residing with the maternal grandmother there. (citing Tenn. Code Ann. § 37-4-201 art. III(d)).

Based on the circumstances of this case, it is not necessary to delve into the issue of whether the permanency plan requirement regarding the ICPC was reasonable and related to the conditions necessitating foster placement. Father complied with the requirement, whether it was reasonable or not. We express no opinion as to whether he should have been required to comply with the ICPC in the first place.

to visit with the children "a minimum of two times per month, for at least four hours per month." Inexplicably, this same requirement was included in the first and second permanency plans, despite the fact that Father lived in Minnesota when the first plan was developed and in Mississippi when the second plan was developed. We conclude that it was not reasonable for DCS to require Father to visit in Memphis a minimum of two times per month while he lived in Minnesota. Therefore, any failure to comply with this requirement is "not relevant to a determination of whether there was substantial noncompliance" with the permanency plan. *In re Valentine*, 79 S.W.3d at 547-49 (explaining that requirements that are not reasonable "are irrelevant, and substantial noncompliance with such terms is irrelevant"). We also note the scarcity of evidence regarding Father's visitation while he remained in Minnesota. The initial permanency plan was developed in April 2017, and Father remained in Minnesota thereafter until he moved to Mississippi in December 2017. However, there was no testimony about the frequency of Father's visitation during that particular eight-month time period. From our review of the voluminous record from the dependency and neglect case, it appears that Father did return to Tennessee for a hearing in the dependency and neglect case in May 2017. The summary from a foster care review board hearing in July 2017 states that Father's visitation had been "sporadic." He returned to Tennessee again in August 2017 for another hearing in the dependency and neglect case. However, there is simply insufficient evidence in the record for us to conclude that Father was substantially noncompliant with the visitation requirement while living in Minnesota.

It was reasonable for DCS to require Father to visit twice per month, for a total of four hours, once he moved to Mississippi. Father testified that once he moved to Mississippi in December 2017, he visited with the children "regularly." The foster care review board summary from January 3, 2018, states that Father had just moved to Mississippi and that he had already attended one visit since his move. Father testified that he would call the foster mother directly, and they set up visits "fairly often" at various locations. Justin testified that he visited with Father "quite a bit" when he lived in Mississippi. Another foster care review board summary states that he "was visiting regularly" and "often" while living in Mississippi.

Mr. Foster testified that when Father lived in Mississippi, his visits were "kind of sporadic but often." He testified that by April 5, 2018, one year after the first permanency plan was developed, Father was "partial[ly] compliant" with the visitation requirement. He confirmed that Father coordinated visits directly with the foster parent, and when asked if Father visited Justin for four hours during two consecutive months, Mr. Foster did not know. He was aware that Father sometimes visited with the children in a church setting, where they attended the church service together and then stayed for dinner thereafter, but he was not sure if such visits lasted four hours. He said Father and Justin also got fast food during some visits. Thus, we cannot say that Father was substantially noncompliant with the visitation requirement while living in Mississippi.

- 24 -

Father admitted that his visits "tapered" once he moved to Missouri. The final permanency plan only required him to visit four hours per month, not twice per month. This was reasonable. However, the testimony regarding Father's visits while living in Missouri was not entirely clear. At trial in July 2019, Father was asked how many times he had visited with Justin on dates that were not court dates in the past year, and he said four to five times. He described two visits with both of the boys at Mother's workplace and mentioned taking Justin to Bartlett to get his haircut in the fall of 2018. At another point, though, Father appeared to concede that the "four to five" visits had occurred while he lived in Mississippi.

Father had not traveled from Missouri to Tennessee solely for the purpose of a visit when he was not scheduled for court. He had scheduled a visit on a Sunday in late 2018 but was late getting on the road, and he did not ultimately get to visit because the foster mother had plans and could not adjust the timing of the visit. Father testified that in the first six months of 2019, he had not seen Justin on any days other than court dates because of the distance, the fact that he was traveling to Tennessee for so many court dates, and the difficulty in scheduling visits around school and work hours. Father said he tried to coordinate visits with his court dates so that he could keep his jobs. He said after court hearings concluded, he would talk to the foster mother about when he could set up a visit. However, it was not entirely clear from the testimony how often Father saw Justin on court dates or for how long. Many times, Father would return to Missouri after court. Father said he tried to coordinate visits with the foster mother on some dates when she already had plans. In June, Father had one visit with Justin after court for Father's Day at a relative's home. Justin described it as a "pool party." They had another visit between the two trial dates. Father maintained contact with Justin when he could not visit and spoke to him once or twice per week.

Mr. Foster testified that he had observed Father talking with Justin at court appearances. However, during 2019, Mr. Foster was only aware of Father visiting with Justin, apart from at the courthouse, in June around Father's Day and on the day between the trial dates. Mr. Foster said that DCS did not offer any type of assistance to Father with respect to visitation. He also said that Justin was not permitted to cross state lines to visit Father, and the only way he could have done so was if DCS did a "travel authorization" for visits, which it did not do in this case.

Based on this evidence, we conclude that Father was, overall, only partially compliant with the permanency plan's visitation requirement. He visited regularly and often while living in Mississippi but hardly any while living in Missouri. From our review of the record, however, this was the only requirement *in the Statement of Responsibilities* that Father had not fulfilled by the time of trial.

We note that on appeal, DCS argues that the permanency plan also required Father to pay child support and that he failed to do so. However, paying child support was never

mentioned in the Statement of Responsibilities in any of the three permanency plans. According to the termination statute, this ground exists when "[t]here has been substantial noncompliance by the parent . . . with *the statement of responsibilities* in a permanency plan[.]" Tenn. Code Ann. § 36-1-113(g)(2) (emphasis added). Tennessee Code Annotated section 37-2-403(a)(2)(A) provides, "The permanency plan for any child in foster care shall include a statement of responsibilities between the parents, the agency and the caseworker of such agency. Such statements shall include the responsibilities of each party in specific terms and shall be reasonably related to the achievement of the goal specified[.]" Thus, for this ground, "[t]he statutory language directs us to look at the 'statement of responsibilities' for [the parent] in each of the [] permanency plans." *In re Askia K.B.*, No. W2010-02496-COA-R3-PT, 2011 WL 4634241, at *8 (Tenn. Ct. App. Oct. 7, 2011).

> [T]he statement of responsibilities serves a substantive purpose. If the parent is required to comply with the permanency plan, then the permanency plan should clearly communicate to the parent: this is what you must do to regain custody of your child. That is the purpose of the parent's statement of responsibilities.

*In re Abigail F.K.*, 2012 WL 4038526, at *13. The "statement of responsibilities" must meet the "substantive requirement[]" of "includ[ing] the responsibilities of each party in specific terms." *In re Nakayia S.*, No. M2017-01694-COA-R3-PT, 2018 WL 4462651, at *3 (Tenn. Ct. App. Sept. 18, 2018). "A permanency plan's failure to state a parent's responsibilities in concrete terms precludes a finding that the parent failed to comply with those responsibilities." *Id.*

This ground for termination "does not require substantial compliance with a permanency plan's '[d]esired outcome[s],' rather, it requires substantial compliance with a plan's **statement of responsibilities**, *i.e.*, the actions required to be taken by the parent or parents." *In re Tamera W.*, No. W2015-01988-COA-R3-PT, 2016 WL 6610359, at *7 n.8 (Tenn. Ct. App. Nov. 9, 2016) (quoting *State Dep't of Children's Servs. v. P.M.T.*, No. E2006-00057-COA-R3-PT, 2006 WL 2644373, at *8 (Tenn. Ct. App. Sept. 15, 2006)) (emphasis in original). For instance, in *Tamera W.*, we explained that "providing the children a 'stable' place to live was listed as a 'Desired Outcome' on the plans, but a desired outcome is different from a statement of responsibility." *Id.* That requirement was not "mandated as one of Father's responsibilities." *Id.*

Here, the permanency plans included a section that stated, "STATEMENT OF RESPONSIBILITIES: This section contains both the desired outcomes and action steps that together comprise the responsibilities of the parents and/or other responsible person(s) to achieve the permanency goals." This Court has previously examined this same language in other plans and "deemed it sufficient to clearly communicate a parent's responsibilities."

[8] *In re Veronica T.*, No. M2017-00726-COA-R3-PT, 2018 WL 1410909, at *8 (Tenn. Ct. App. Mar. 21, 2018). However, in Father's permanency plans, there was no mention of paying child support in the designated "Statement of Responsibilities." The plans included another section summarizing "the Parents' Responsibilities," but again, paying child support was never mentioned as a responsibility.

The permanency plans did include a small section on child support ten pages away from the section entitled "Statement of Responsibilities." It stated, "List each person who will provide child support, along with the amount being paid and what form of support (i.e. good-faith payment, clothes, gifts, etc.)". It then stated, "The father, Timothy S[.] will provide, child support for Justin A[.] in the form of good-faith payments, clothes, gifts, etc." Again, a permanency plan "should clearly communicate to the parent: this is what you must do to regain custody of your child. That is the purpose of the parent's statement of responsibilities." *In re Abigail F.K.*, 2012 WL 4038526, at *13. "[I]t is axiomatic that noncompliance with a permanency plan's statement of responsibilities requires that the alleged noncompliance be based on a requirement *in* the statement of responsibilities." *In re Nakayia S.*, 2018 WL 4462651, at *4 (concluding that a verbal instruction was insufficient). By including a designated "Statement of Responsibilities" and specifying that *those steps* constituted "the responsibilities of the parents . . . to achieve the permanency goals," DCS did not clearly communicate to Father that he must also pay child support in order to gain custody of the child. *See In re Askia K.B.*, 2011 WL 4634241, at *8-9 (concluding that a permanency plan section on visitation allowed for visits but that it did not clearly state that visiting was a "responsibility" of the parent under the plan). Thus, in analyzing this ground, we will not consider Father's payment of child support when considering whether he was in substantial noncompliance "with the statement of responsibilities in a permanency plan[.]" Tenn. Code Ann. § 36-1-113(g)(2).[9]

---

[8] "[T]his Court has admonished DCS on several occasions for its failure to clearly outline the parents' statement of responsibilities in a section of the permanency plan." *In re Navada N.*, 498 S.W.3d 579, 603 (Tenn. Ct. App. 2016); *see, e.g.*, *In re Abigail F.K.*, 2012 WL 4038526, at *13 ("It is difficult for the Court to find that Mother failed to substantially comply with the plan's statement of responsibilities if the plan does not contain one.") However, we have also held that a separately labeled "Statement of Responsibilities" section is "not necessarily fatal," "provided that the parent's responsibilities are clear from the body of the permanency plan." *In re Benjamin A.*, No. E2015-00577-COA-R3-PT, 2016 WL 944469, at *17 (Tenn. Ct. App. Mar. 14, 2016). Here, however, the plans *did* contain a "Statement of Responsibilities" section.

[9] We note that during trial, Mr. Foster was asked about whether the issue of child support was addressed in the "Statement of Responsibilities" section. The following exchange occurred:

Q. Okay. And just to be clear, on these permanency plans, does it tell him he needs to provide some sort of financial support for his son and visit his son in the actions steps, or is that only in the visitation section?
A. It's in the action steps that the father would provide support and visit with the Youth a minimum of four hours a month. And it's also placed in a small section on the permanency plan that parents will provide support to the Youth in the form of good faith payments, gifts and et cetera.

In summary, we conclude that Father met the following requirements of the Statement of Responsibilities: obtaining and maintaining stable housing and employment, notifying DCS when he moved to Mississippi, following through with the ICPC process, going to juvenile court to legitimate Justin, completing a parenting assessment, and maintaining contact with DCS. He only partially met the visitation requirement. Overall, considering Father's efforts, the record does not clearly and convincingly establish that his noncompliance with the permanency plans was substantial. *See, e.g.*, *In re Valentine*, 79 S.W.3d at 549 (reversing this ground where the parent had stable housing, attended parenting classes, and partially complied with the visitation requirement, but did not comply with requirements of attending individual counseling and undergoing a neuropsychiatric evaluation). We reverse the trial court's finding regarding this ground for termination. The best interest analysis is pretermitted as to Father. Because this was the only remaining ground for termination of his parental rights, we reverse the termination of Father's parental rights.

### C. Grounds for Termination Against Mother

There are three grounds for termination at issue with respect to Mother: severe child abuse, sentence for severe child abuse, and failure to manifest a willingness and ability to assume custody. We address each in turn.

### 1. Severe Child Abuse

When the termination petition was filed, Tennessee Code Annotated section 36-1-113(g)(4) provided that one ground for termination of parental rights existed if:

> The parent [] has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against the child who is the subject of the petition or against any sibling or half-sibling of such child, or any other child residing temporarily or permanently in the home of such parent[.]

Tenn. Code Ann. § 36-1-113(g)(4) (2017).[10] On September 6, 2011, the circuit court of Shelby County entered an order adjudicating the children dependent and neglected and finding that "[Mother's] failure to protect Saniiyah rose to the 'knowing' requirement to establish severe abuse as to Saniiyah as set out in Tenn. Code Ann. § 37-1-102(b)(23)(A)."

From our careful review of the three permanency plans, child support was only mentioned in the "small section" referenced by Mr. Foster and not in the action steps in the Statement of Responsibilities section.

[10] The statute has since been amended to provide that this ground exists if the parent has been found to have committed severe child abuse "against any child." Tenn. Code Ann. § 36-1-113(g)(4) (Supp. 2020).

As we noted in a previous appeal filed by Calvin, "Mother did not appeal the judgment of the circuit court." *In re Jaylen J.*, No. W2011-02347-COA-R3-JV, 2012 WL 3574685, at *2 (Tenn. Ct. App. Aug. 21, 2012). Additionally, we note that Saniiyah was the half-sister of Justin and Jaylan.

"A finding of severe abuse in dependency and neglect proceedings has serious ramifications not ordinarily at stake in cases of less severe conduct, since a finding of severe abuse can serve as a ground for termination of parental rights." *In re Kaliyah S.*, 455 S.W.3d at 537 n.5 (citing *In re Samaria S.*, 347 S.W.3d 188, 201 (Tenn. Ct. App. 2011)).

> The most serious consequence of a finding that a parent has committed severe child abuse is that such a finding, in and of itself, constitutes a ground for termination of parental rights. . . . The ground itself is proved by a prior court order finding severe child abuse, and the issue of whether abuse occurred is not re-litigated at the termination hearing.

*In re Samaria S.*, 347 S.W.3d at 201 (quoting *DCS v. M.S.*, No. M2003-01670-COA-R3-CV, 2005 WL 549141, at *10 (Tenn. Ct. App. Mar. 8, 2005)). In a termination of parental rights proceeding, the doctrine of res judicata prevents a parent from re-litigating whether he or she committed severe child abuse when such a finding has been made in a previous dependency and neglect action. *In re I.E.A.*, 511 S.W.3d 507, 517 (Tenn. Ct. App. 2016); *In re Dakota C.R.*, 404 S.W.3d 484, 497 (Tenn. Ct. App. 2012). Upon a finding of severe abuse, "one ground for termination of the parent's parental rights is effectively established." *In re Samaria S.*, 347 S.W.3d at 201. "The plain language of the statute does not require that the prior order have any specific temporal proximity or nexus to the current child at issue or the proceedings currently being adjudicated." *In re I.E.A.*, 511 S.W.3d at 516. As such, the final order of the circuit court finding severe abuse by Mother against the children's half-sibling is sufficient proof of this ground, and the trial court did not err in finding that the ground of severe abuse was proven by clear and convincing evidence. *See In re I.E.A.*, 511 S.W.3d at 517; *In re Eric J.P.*, No. M2012-02082-COA-R3-PT, 2013 WL 1788547, at *4 (Tenn. Ct. App. Apr. 24, 2013) ("[DCS] proved the ground of severe abuse by proving that Mother and Father had been found to have committed severe abuse of the Children's half-sibling[.] No other evidence was required.")

### 2. Sentence for Severe Child Abuse

When the termination petition was filed, the relevant statute provided that another ground for termination existed if:

> The parent [] has been sentenced to more than two (2) years' imprisonment for conduct against the child who is the subject of the petition, or for conduct against any sibling or half-sibling of the child or any other child residing temporarily or permanently in the home of such parent [], that has been found

- 29 -

under any prior order of a court or that is found by the court hearing the petition to be severe child abuse, as defined in § 37-1-102. Unless otherwise stated, for purposes of this subdivision (g)(5), "sentenced" shall not be construed to mean that the parent [] must have actually served more than two (2) years in confinement, but shall only be construed to mean that the court had imposed a sentence of two (2) or more years upon the parent[.]

Tenn. Code Ann. § 36-1-113(g)(5) (2017).[11] "'[S]ome court order, either by a prior court or the court hearing the termination petition, must find that the conduct underlying the conviction constituted severe child abuse as defined by section 37-1-102.'" *In re C.S.*, No. E2019-01657-COA-R3-PT, 2020 WL 2066247, at *6 (Tenn. Ct. App. Apr. 29, 2020) (quoting *In re Shyronne D.H.*, No. W2011-00328-COA-R3-PT, 2011 WL 2651097, at *9 (Tenn. Ct. App. July 7, 2011)).

Mother received a sentence of ten years for conduct against Saniiyah that was found under a prior court order to be severe child abuse. As the statute makes clear, the fact that Mother has not served her sentence in confinement does not preclude application of this ground. *See, e.g.*, *In re Shyanne H.*, No. M2019-02127-COA-R3-PT, 2020 WL 3481695, at *8 (Tenn. Ct. App. June 25, 2020) ("The fact that Father did not serve any jail time does not preclude termination of his parental rights on this ground."); *In re Adrian M.-M.*, No. W2019-00931-COA-R3-PT, 2019 WL 5595846, at *11 (Tenn. Ct. App. Oct. 30, 2019) (affirming where a mother pled guilty to attempted aggravated child abuse and received eight years of supervised probation). This ground was also sufficiently proven.

### 3. Failure to Manifest an Ability and Willingness to Assume Custody

We now turn to the final ground alleged against Mother and at issue on appeal. It applies when:

A parent [] has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Tenn. Code Ann. § 36-1-113(g)(14). The first part of this statute "places a conjunctive obligation on a parent or guardian to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child." *In re Neveah M.*, No. M2019-00313-SC-R11-PT, --- S.W.3d ----, 2020 WL 7258044, at *14 (Tenn. Dec. 10, 2020). As a result, "[i]f a person seeking to terminate parental rights proves by clear

---

[11] This subsection has also been amended, and it now applies to sentences for conduct against "a child." Tenn. Code Ann. § 36-1-113(g)(5) (Supp. 2020).

and convincing proof that a parent or guardian has failed to manifest either ability or willingness, then the first prong of the statute is satisfied." *Id.*

When analyzing a parent's *ability* to assume custody, we focus on his or her "lifestyle and circumstances." *In re Jonathan M.*, No. E2018-00484-COA-R3-PT, 2018 WL 5310750, at *5 (Tenn. Ct. App. Oct. 26, 2018). In assessing a parent's *willingness*, "'we look for more than mere words[.]'" *In re Jaxx M.*, No. E2018-01041-COA-R3-PT, 2019 WL 1753054, at *9 (Tenn. Ct. App. Apr. 17, 2019) (quoting *In re Cynthia P.*, No. E2018-01937-COA-R3-PT, 2019 WL 1313237, at *8 (Tenn. Ct. App. Mar. 22, 2019)). A parent's lack of effort can undercut his or her claim of willingness. *Id.*; *see, e.g., In re Antonio J.*, No. M2019-00255-COA-R3-PT, 2019 WL 6312951, at *9 (Tenn. Ct. App. Nov. 25, 2019) (recognizing that a mother's "words" indicated willingness but her actions portrayed "unwillingness to make the effort required for reunification"). "Parents must have demonstrated their willingness by attempting to overcome the obstacles that prevent them from assuming custody or financial responsibility for the child." *In re Jonathan M.*, 2018 WL 5310750, at *5.

Since the death of Saniiyah in 2010, Mother had only been allowed supervised visitation with Justin and Jaylan. However, she had maintained visitation with the children since that time, first while they were in the care of the maternal grandmother and then while they were in foster care. When the children were dropped off at her doorstep in early December 2016, Mother took the boys into her home and contacted DCS. Someone came to Mother's home, took photographs, asked questions, and informed Mother that she needed to obtain paperwork from juvenile court before she could enroll them in school. In January 2017, Mother filed a pro se petition seeking modification of the existing order granting permanent custody to the maternal grandmother. Her petition stated that she was now stable and that she desired to have the children legally in her care and custody. However, in March 2017, the juvenile court magistrate removed the children from Mother's home on its own motion.

In April 2017, the first permanency plan was developed for Mother, which required her to go to court with Father to legitimate Justin, maintain stable housing and income, complete a parenting assessment at her own expense, and visit the children. However, it also noted that DCS had been relieved of making efforts to assist Mother and so she would be responsible for completing these tasks without any assistance. From our review of the record, Mother largely met the aforementioned responsibilities. She went with Father to legitimate Justin. When Mother testified at trial in September 2019, she had been employed at Taco Bell for three years and was working full-time as a shift manager making $9.25 per hour. She was halfway through an eight-week training period for promotion to assistant manager. She had told DCS where she was working and said they never asked for proof. (From our review of the permanency plans, only the third one required Mother to produce pay stubs and a lease.) For the past two and one-half years, Mother had lived in a two-bedroom house with a lease in her own name. Mother received food stamps but

paid rent and household expenses and had her own vehicle. She had never been late on her rent payment. She had given DCS her address but did not recall being asked for a copy of her lease. Mr. Foster agreed that Mother provided him with her address and informed him when she moved once. He had not attempted a home visit and was not sure whether he ever asked Mother for a copy of her lease. Mother had not sent any child support for Justin and Jaylan but had sent occasional gifts for them.

The only person residing with Mother in her two-bedroom house was her two-year-old son. Mother's seven-year-old daughter remained with the grandparent who took physical custody at her birth while Mother was incarcerated. However, Mother retained legal custody and had visits with her every other weekend. She was still serving her ten-year sentence on probation, but she had not had any violations of probation. As terms of her probation, Mother had completed community service, moral recognition therapy, anger management, and two rounds of parenting classes. Mother testified that she visited Justin and Jaylan one to three times per month depending on the foster mother's schedule. She talked to the children three to four times per week and communicated with them on social media almost every day. She testified that she wanted the boys to "go home with family," and if not with her then with Father. Mr. Foster confirmed that Mother "has stated she wants custody."

Under these circumstances, Mother has manifested a *willingness* to assume legal and physical custody of the children. Aside from her stated willingness, her actions have also demonstrated her willingness in that she filed a pro se petition to regain custody of the children and mostly complied with the requirements of the permanency plan. As for *ability*, again, we must consider Mother's lifestyle and circumstances.[12] She has stable

---

[12] To the extent that it impacts Mother's "ability" to assume custody, we note Mr. Foster's trial testimony that even if Mother had completed everything possible on her permanency plan, DCS would not be able to send the children to live with her. Regarding the disposition of children in dependency and neglect cases, Tennessee Code Annotated section 37-1-130(c) states:

> No child *who has been found to be a victim of severe child abuse* shall be returned to the custody or residence of any person who engaged in or knowingly failed to protect the child from the brutality or abuse unless the court finds on the basis of clear and convincing evidence that the child will be provided a safe home free from further such brutality and abuse.

(emphasis added). However, Justin and Jaylan were not found to be victims of severe child abuse. Saniiyah was. In the context of dependency and neglect proceedings, "there is no statutory authority that would allow a child who was not subjected to conduct constituting 'severe child abuse' to be deemed a severely abused child based on abuse perpetrated against a sibling." *In re Nirvanna S.*, No. E2010-01358-COA-R3-JV, 2011 WL 684196, at *9 (Tenn. Ct. App. Feb. 28, 2011). Thus, in *In re Samuel D.*, 536 S.W.3d 447, 457 (Tenn. Ct. App. 2016), we held that the trial court erred in applying section 37-1-130(c) and its clear and convincing evidence "threshold" to the return of two half-siblings when they were not themselves directly subjected to abuse.

When there is a finding of severe child abuse, DCS is relieved of the obligation to use reasonable

housing and employment, has complied with the terms of her probation, and has another child living with her apparently without incident. There was no evidence of violence, substance abuse, or criminal activity in Mother's current home. As such, we simply cannot find by clear and convincing evidence that Mother has failed to manifest an ability to personally assume legal and physical custody of the children. *See In re Kyland F.*, No. E2019-01058-COA-R3-PT, 2020 WL 957647, at *6 (Tenn. Ct. App. Feb. 27, 2020) (affirming the ground of severe child abuse but reversing this ground for termination where the parents took steps to complete the tasks required of them once they were released from incarceration). We reverse this ground for termination of Mother's parental rights.

### C.   Best Interest

If at least one ground for termination has been proven by sufficient evidence, "the court next determines whether the proof amounts to clear and convincing evidence that terminating parental rights is [in] the best interests of the child." *In re Gabriella D.*, 531 S.W.3d at 681 (citing *In re Carrington H.*, 483 S.W.3d at 523). Tennessee's termination statute recognizes that termination of parental rights is not always in the child's best interest. *In re Brianna T.*, No. E2017-01130-COA-R3-PT, 2017 WL 6550852, at *5 (Tenn. Ct. App. Dec. 22, 2017) (citing *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005)). Tennessee Code Annotated section 36-1-113(i) lists nine statutory factors for consideration. As our supreme court explained in *In re Gabriella D.*, 531 S.W.3d at 682:

> Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. *In re Audrey S.*, 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. *See In re Audrey S.*, 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. *In re Carrington H.*, 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular

---

efforts toward reunification, "it is more difficult for the parent to regain custody" of that child, and one ground for termination of parental rights is effectively established. *In re Samaria S.*, 347 S.W.3d at 201. However, this statute does not prevent Justin and Jaylan from ever being returned to Mother. We note that the juvenile court relied on section 37-1-130(c) during the dependency and neglect proceeding, but the de novo appeal to circuit court was still pending at the time of the termination trial.

case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

We must bear in mind that the child's best interest is viewed from the child's perspective rather than the parent's perspective. *Id.* at 681. "'[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child.'" *Id.* (quoting Tenn. Code Ann. § 36-1-101(d)).

"Because denial of a petition to terminate parental rights does not in and of itself affect the custody of a child, the court's task is not to choose between two home situations. Instead, the inquiry should address itself to the impact on the child of a decision that has the legal effect of reducing the parent to the role of a complete stranger." *In re Aiden R.*, 2016 WL 3564313, at *10 (quoting *In re C.B.W.*, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *6 (Tenn. Ct. App. June 26, 2006)) (internal quotation omitted).

In analyzing whether it is in the best interest of Justin and Jaylan to terminate Mother's parental rights, we will address each of the statutory factors for consideration. The first is "[w]hether the parent [] has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent[.]" *See* Tenn. Code Ann. § 36-1-113(i)(1). The trial court found that this factor weighed against Mother because she "has not completed any tasks on the permanency plans and [she] still denies her role in her daughter's death." The record simply does not support this finding regarding the permanency plan. Mother legitimated Justin, had stable housing and employment, and consistently visited the children. As terms of her probation, she had completed community service, moral recognition therapy, anger management, and parenting classes. Although she maintained that she did not know Calvin was abusing Saniiyah, she said if she could change anything, she would take Saniiyah to the doctor and recognized that if she had only done so, she might still be alive.

By the time of trial in 2019, nine years had passed since Saniiyah's death. Justin and Jaylan were ages four and one when she died, and they were ages thirteen and ten at the time of trial. Calvin was serving a life sentence, and Mother lived alone with the exception of her two-year-old son. She also retained legal custody of her seven-year-old daughter. There was nothing in the record to suggest that DCS had any concerns about Mother's home not being safe for her two-year-old son or her seven-year-old daughter. There was no testimony about any violence, criminal behavior, or substance abuse in Mother's home. Thus, from the evidence presented, it appears to this Court that Mother has adjusted her circumstances so as to make her home safe for children.

The second factor to consider is "[w]hether the parent [] has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration

of time that lasting adjustment does not reasonably appear possible." *See* Tenn. Code Ann. § 36-1-113(i)(2). Mother made these adjustments to her circumstances even though DCS was relieved of making reasonable efforts to assist her. A lasting adjustment does appear possible.

The third factor is "[w]hether the parent [] has maintained regular visitation or other contact with the child." *See* Tenn. Code Ann. § 36-1-113(i)(3). The trial court found that Mother "has maintained regular visitation with the children" and that this factor weighed against termination of her parental rights. We agree. Mother visits the children in person one to three times per month as permitted by the foster parent and talks to them three to four times per week. According to Justin, they communicate "[a]lmost every day" through social media. Justin testified that it would bother him if Mother's parental rights were terminated and she was not allowed to contact him anymore. He said he would prefer to live with Mother if he could. Thus, this factor weighs against termination.

The fourth factor is "[w]hether a meaningful relationship has otherwise been established between the parent [] and the child." *See* Tenn. Code Ann. § 36-1-113(i)(4). The trial court found that "a meaningful relationship has been established between [Mother] and her children" and that this factor also weighed against termination of her parental rights. Again, for the reasons discussed with respect to the previous factor, we agree with the trial court's conclusion.

The fifth factor to consider is "[t]he effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition." *See* Tenn. Code Ann. § 36-1-113(i)(5). With only a single sentence of explanation, the trial court found that this factor weighed in favor of terminating Mother's parental rights because "[t]he children have bonded strongly to the foster parents and a change in placement would adversely affect them." We have no doubt that the children had bonded with the foster mother during the two years that they resided with her prior to trial. Still, Justin testified that his first preference would be to live with Mother (and his two-year-old half-brother), and his second preference would be to live with Father. As such, at least for Justin, the evidence does not support a finding that his emotional or psychological condition would be hurt by a change of caretakers. There was no contrary testimony for Jaylan or any proof as to any medical condition of the children. Therefore, we conclude that this factor also weighs in Mother's favor.

The sixth factor is "[w]hether the parent [], or other person residing with the parent [], has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household[.]" *See* Tenn. Code Ann. § 36-1-113(i)(6). This factor weighs against Mother. The 2011 order of the circuit court found that Mother never sought medical attention for Saniiyah despite witnessing signs of serious distress and severe injury for hours. It found that Mother's failure to protect Saniiyah rose to the "knowing" requirement to establish severe abuse by Mother.

We also note, however, that the juvenile court found no proof of direct physical harm to Justin or Jaylan. In addition, we recognize that Calvin is serving a life sentence for the murder, and there was no evidence that Mother had resided with or engaged in a relationship with anyone else since that time who might pose a danger to the children. Likewise, the record contains no evidence that Mother herself had committed any acts of violence that would endanger the child currently living with her. So, although this factor weighs against Mother, we give it somewhat less weight in light of the nine years that had passed and Mother's current circumstances. *See, e.g.*, *In re Gabriella D.*, 531 S.W.3d at 684 (noting a history of severe abuse when considering this factor but pointing out that "[b]y the time of this trial [] more than three years had passed since Mother engaged in the reprehensible conduct that cost her the custody of these children").

The seventh factor to consider is "[w]hether the physical environment of the parent's [] home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent [] consistently unable to care for the child in a safe and stable manner[.]" *See* Tenn. Code Ann. § 36-1-113(i)(7). There was no evidence to suggest that Mother's home was not healthy and safe. She had completed numerous terms of her probation and had no violations, suggesting there is no criminal activity in the home. There was no evidence of alcohol or substance use by Mother at any point in the history of this case. Therefore, this factor weighs in Mother's favor.

Factor eight is "[w]hether the parent's [] mental and/or emotional status would be detrimental to the child or prevent the parent [] from effectively providing safe and stable care and supervision for the child[.]" *See* Tenn. Code Ann. § 36-1-113(g)(8). The trial court noted that no evidence was presented that Mother's mental and emotional status would be detrimental to the children or prevent her from providing safe and stable care and supervision for them. We agree.

The ninth and final factor is "[w]hether the parent [] has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101." *See* Tenn. Code Ann. § 36-1-113(g)(9). The trial court found that this factor weighed in favor of termination because Mother had not paid consistent child support but only provided minimal gifts. We agree with this assessment.

Ultimately, "[t]he dispositive issue in this appeal is a question of law: whether the facts presented amount to clear and convincing evidence that termination of Mother's parental rights is in the best interests of the children." *In re Gabriella D.*, 531 S.W.3d at 680. Considering all of the statutory factors, we do not find clear and convincing evidence that termination of Mother's parental rights is in the best interest of Justin and Jaylan. Given the abuse of Saniiyah in the past, this is not an easy decision. However, under the unique facts of this case, we do not believe that this single factor should be determinative. *See In re Gabriella D.*, 531 S.W.3d at 685 (affirming a finding of severe child abuse but

holding that "the Court of Appeals erroneously placed outcome-determinative weight on statutory factor six, and more specifically, on the proof regarding Mother's severe neglect of the children in the past," while failing to recognize her many positive achievements and the fact that almost all other factors weighed against termination); *see also In re Allyson P.*, No. E2019-01606-COA-R3-PT, 2020 WL 3317318, at *14 (Tenn. Ct. App. June 17, 2020) (affirming the ground of severe abuse but concluding that the facts presented "do not satisfy the heightened standard of proof to allow us to conclude that termination of Mother's parental rights is in Allyson's best interest"). As our supreme court said in *Gabriella D.*, 531 S.W.3d at 686:

> By so holding, we do not at all condone or excuse the conduct that resulted in the removal of these children from Mother's custody. . . . And we certainly do not minimize the genuine concern and affection Foster Parents have for these children. Our decision instead results from an objective and comprehensive review of the record to determine whether the facts presented satisfy the constitutionally mandated heightened standard of proof. This heightened standard is designed specifically to reduce the risk of erroneous decisions depriving parents of their precious and fundamental rights to the care and custody of children. In this case, this heightened standard of proof was not satisfied. We recognize that the result in this case is unusual, but this is an unusual case. Too often parents fail to rehabilitate themselves and make the changes needed to avoid losing their parental rights forever. The proof in this record establishes that Mother has been able to make the necessary adjustments. This is precisely how the system is designed to function. Should Mother revert to the reprehensible conduct that started the process that culminates with this decision, DCS will have the option of filing a termination petition, as the circuit court's finding of severe abuse has not been disturbed on appeal. Tenn. Code Ann. § 36-1-113(g)(4).

## V.    CONCLUSION

For the aforementioned reasons, we reverse the termination of parental rights and remand for further proceedings. Costs of this appeal are taxed to the State of Tennessee, for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE